## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MICHELLE FANIOLA, individually and
as the parent and natural guardian of
MATTHEW HART, a minor child,

      Plaintiffs,

vs.                                                                                                     No. CIV- 02-1011 JB/RLP

MAZDA MOTOR CORPORATION, a foreign
corporation, MAZDA MOTOR OF AMERICA,
a California corporation, and FORD MOTOR
COMPANY, a Michigan corporation,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment Against Plaintiff's Claim for Punitive Damages, filed March 19, 2004 (Doc. 85). The primary issue is whether the Plaintiff, Michele Faniola, has shown the Court evidence that the Defendants, Mazda Motor Corporation ("MC") and Mazda Motor of America ("MNAO") (collectively referred to as "Mazda"), engaged in any willful, wanton, intentional, reckless or deliberate acts for which Faniola can be awarded punitive damages.[1] Because Faniola has not established a genuine issue of material fact whether she is entitled to an award of punitive damages, the Court will grant the Defendants' motion and enter summary judgment dismissing Faniola's seventh cause of action for punitive damages.

---

[1] When Mazda filed its motion, Ford Motor Company was a co-defendant. On March 23, 2004, the Court entered summary judgment for Ford and against Faniola on the entire case. See Order, filed March 23, 2004 (Doc. 88).

**FACTUAL BACKGROUND**

On August 23, 1999, Faniola was driving a 1992 Mazda Protege on Interstate 40 in Bernalillo County, New Mexico when she ran over a semi-truck trailer brake shoe that punctured the fuel tank. See Complaint for Personal Injuries Due to Defective Product ¶ 12, 14, at 3, 4, filed August 15, 2002 (Doc. 1). Faniola contends that she was driving between 55 and 70 miles per hour when she struck the large object. The brake shoe was 15 ½ to 16 inches in length and weighed nearly 20 pounds.

The brake shoe rotated under Faniola's vehicle, striking several places, and punctured her gas tank. Faniola saw smoke coming from the back of her vehicle and pulled to the side of the road. When she attempted to exit her vehicle from the driver's side, she noticed flames coming from underneath the car. She proceeded to stand on the driver's seat, step to the passenger seat, paused to grab her purse, sit down on the passenger seat, push open the door, and run from the vehicle.

Mazda located the fuel tank on the 1992 Mazda Protege near the back of the vehicle, just in front of the rear suspension and positioned it so that it did not extend below the Protege's lowest plane. See Deposition of Ronald Elwell, Faniola's Expert, at 75-76 (taken November 13, 2003). According to Faniola's expert, the location of the fuel tank was not defective. See id. at 75. Mazda chose the fuel tank's location for safety reasons and positioned the fuel tank such that it would be protected from any impact from the sides, rear, front, bottom, or top. See Deposition of Kenji Matsuda (Volume I) at 85, 168-69 (taken January 26, 2004).

According to Faniola's expert, the 1992 Mazda Protege fuel tank was in an optimum location. See Deposition of Jerry Wallingford at 38 (taken November 7, 2003). Mazda's vehicles are designed to meet and exceed United States federal safety standards (Federal Motor Vehicle Safety Standards or "FMVSS"), including the federal collision standard, FMVSS 301. See Mazda's Answer to

Interrogatory No. 27; Matsuda Depo. at 63. The FMVSS preamble requires manufacturers to "address safety issues arising from the environment of use of the product and to design to eliminate the risk to public safety." Elwell Report at 3.

Before Mazda released the vehicle to the public, Mazda performed various crash testing, road surface contact tests, and comprehensive durability driving tests. See Matsuda Depo. at 85-86, 97, 144-45; Mazda's Second Supplemental Answer to Interrogatory No. 5. Moreover, the fuel tank's design complied with and exceeded the most stringent of testing, including the Federal Motor Vehicle Safety Standard 301, Fuel System Integrity. See Matsuda Depo. at 96-97. There is no specific FMVSS301 standard relating to vehicle underbody fuel tank penetration. Mazda did not test its steel fuel tanks for puncture resistance from road debris, guardrails, posts or other on/off road hazards. See Mazda's Second Supplemental Answer to Interrogatory 5; Matsuda Depo. at 141. Mazda did not try to determine the minimum required force to rupture its steel tanks. See Matsuda Depo. at 144-46. Nevertheless, until the time of this accident, Mazda had not encountered any accident or complaint or report of a failure, or malfunction, or failure of performance of the fuel tank or fuel tank system in the 1990-1994 Mazda Protege. See id. at 87-88; Mazda's Supplemental Answer to Interrogatory 20.

Faniola asserts that Mazda and the auto industry have known for years that two fundamental safety design principles must be followed to lessen fuel tank hazards: (i) locating the tank away from areas where it is most at risk to be ruptured and (ii) manufacturing protections for the tank to retain its contents more effectively. See Matsuda Depo. at 67-69 (agreeing with two basic design engineering principles that (i) "when you are made aware of a potential hazard to the driver or passengers of an automobile, it is a basic design rule to at least consider whether you can design that

hazard, that risk, out and eliminate the hazard or risk in the design" and (ii) "where you cannot design out a particular hazard or risk, then the design rules of safety say you need to try and guard against that hazard or risk."). Faniola asserts that the location that Mazda chose for the fuel tank in the 1992 Mazda Protege was only 7 ½ inches from the ground in a high center position in front of the rear suspension made it vulnerable. See Wallingford Depo. at 107-108; Elwell Depo. at 75 and 244. Faniola contends that the fact the tank was still 1+ inches higher than the lower floor pan is an inadequate protection for the fuel tank. See Elwell Depo. at 140. Faniola contends that, given its placement of the tank near potential objects that can puncture the tank, Mazda had a duty to adequately shield the tank.

Faniola asserts that fundamental design knowledge provides that any fuel leak creates a high danger of fire in the event of a collision because only three elements are required to set off a fire: fuel, oxygen, and an ignition source. Oxygen is in plentiful supply and there are numerous ignition sources present during a collision. With these conditions, Faniola asserts that the potential for life threatening fire is a virtual certainty.

Faniola contends that Mazda knows about this risk and its lead design engineer for the 1992 Mazda Protege, Kenji Matsuda, knows about this risk. See Matsuda Depo. at 94-96; Mazda's Comments to the National Highway Transportation Safety Administration ("NHTSA") Regarding Rulemaking at 1-2 (attached to letter from Shintaro Nakatsuka to NHTSA, dated March 4, 1993)("Comments"); Elwell Depo. at 55-57, 239-40. Mazda follows the basic rule of design safety where the greater the risk of serious injury or death, then the greater the need either to eliminate or to guard against those hazards or risks. See Matsuda Depo. at 98. Mazda is aware of the serious risk of injury or death from vehicle fires: "Approximately 1400 vehicle occupants per year die in

vehicle crashes involving fire. Moreover, approximately 9000 occupants are injured in such crashes." Comments at 1.

Matsuda is also aware of the exposure to the underbody of vehicles by road debris from his experience of seeing objects "flying off a truck" onto a highway or "wheelcaps" lying on the road. See Matsuda Depo. at 73. In his deposition, Matsuda stated: "It's not possible to foresee every single piece maybe on the roadway." Id. at 76. According to Matsuda, "[w]hen we design, we do consider that the driver may encounter some road debris while driving on the roadways, such as stones and paper trash or wood pieces." Id. at 77. Further, "in this world, it may be possible to have something bigger." Id. at 78. In evaluating any potential hazard of road debris to the fuel tank, "it is not possible to predict what would happen." Id. at 84.

Mazda's experts agree that the vehicle underbody is potentially exposed to objects and that, if the fuel tank is in harm's way, it is vulnerable to penetration and rupture. See Deposition of James J. Schultz at 79-87 (taken March 26, 2004); Deposition of Paul D. Beauchamp at 8-10 (taken March 25, 2004). A Clinical Review of National Automotive Sampling System ("NASS") Fire Case Reports prepared for NHTSA in January 1997 reviewing 136 cases from the years 1993-1995 demonstrated that 16.1% of motor vehicle fires originated in the fuel tank, with most of those involving ignition of gasoline leaking from ruptures/punctures. See Clinical Review of NASS Fire Case Reports, January 24, 1997 at 1-4. In 18.9% of the fires originating in the fuel tank, the general area of damage for the fuel tank was the undercarriage. See id.

Faniola asserts that, while reports of road objects, rails, or posts rupturing fuel tanks may be rare -- according to Elwell ".02%," Elwell Depo. at 88 -- the known consequences of such collision are devastating. Elwell stated: "The .02 includes those, along with poles, guardrails, bridge culverts,

and things of that sort that are somewhat attacking the underside of the vehicle, given that it stays on its four wheels." Elwell Depo. at 89-90. Faniola provides several examples of such collisions: (i) an 18-inch steel bracket on the road punctured a 1994 Chrysler minivan's gas tank, sparks ignited, and "within seconds" the van burst into flames killing five and leaving three survivors badly burned, see Matsuda Depo at 294; Schultz Depo. at 85; (ii) in 1984 a Lincoln Towncar hit a large metal object on the highway and caught on fire, see Elwell Depo. at 263; (iii) a Ford station wagon's fuel tank was punctured when the driver attempted to avoid an object on the road and hit a guardrail, see Elwell Depo. at 87; (iv) a Ford Aero Star struck a mud flap bracket on the roadway and erupted in fire killing three young girls, see Beauchamp Depo. at 9-12; (v) an 80's vintage Volkswagon hit a guardrail post that had been dislodged as a result of a single car collision erupting into fire, see id. at 9-10; (vi) a 1989 Ford Taurus ran off the road and burst into flames after a metal post on the guardrail ruptured the gas tank killing two and leaving a survivor badly burned; (vii) a 1995 Ford Taurus overturned into a guardrail, which ruptured the gas tank killing four and leaving a survivor badly burned; (viii) a 1978 Plymouth Volare landed on a "T" post and punctured the fuel tank, see Matsuda Depo. at 83; and (ix) a 1994 letter from the Center for Auto Safety to the Acting Director of NHTSA reports two additional cases of road debris rupturing fuel tanks on Chrysler Minivans similar to the one that resulted in a fuel fed fire that killed 6 children in Wisconsin.

On Interstate 40 in New Mexico, 160 property damage or injury incidents were reported over a three-year period resulting from objects or debris lying on the road. The fire inspector who responded to Faniola's accident stated that it was not unusual for the department to investigate incidents of fuel tank punctures in the East Mountain area. See Affidavit of Don Scott ¶ 4, at 1 (executed April 5, 2004).

Faniola asserts that the NHTSA reports instances of complaints of Mazda sedan (including Mazda Protege) fuel tank leaks, and it was NHTSA's practice to forward these complaints to the manufacturers. Matsuda stated that, as a design engineer, he would like to know of the causes of any reported fuel tank leaks involving any Mazda vehicles. See Matsuda Depo. at 286. Matsuda never received NHTSA reports personally. See id. at 281-282.

Matsuda explained "what is important for engineers is to know the cause of accidents. If there is fire or accidents occur, it is important to know the cause of it. By understanding the cause of it, then we can take the next step." Matsuda Depo. at 285. The NHTSA complaints include information about thirteen complaints related to fuel leaks on Mazda vehicles. See Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment Against Plaintiff's Claim for Punitive Damages at 8, filed April 5, 2004 (Doc. 100). Faniola asserts that Mazda did not make an effort to look for data on accidents involving fuel tank punctures and, if Mazda had done so, it would have learned of incidents where objects in the road caused punctures to fuel tanks of other vehicles, including: (i) 1992 Buick Roadster -- ran over object that hit and made a hole in plastic tank; (ii) 1995 Cadillac Deville -- omission shields on plastic fuel tank allowed road debris to puncture it; (iii) 1983 Chevrolet Cavalier -- fuel tank punctured causing severe fuel tank leak due to road hazard; (iv) 1983 Pontiac Bonneville -- gas tank ripped open upon hitting items in road; (v) 1987 Oldsmobile Ceria -- rock from rim hit fuel tank, cracked tank causing leak; and (vi) 1987 Plymouth Voyager -- vehicle hit construction materials on highway, penetrated gas tank and fuel leak due to lack of shield over tank.

Faniola asserts that, at the time Mazda manufactured the 1992 Mazda Protege, Mazda had feasible and available means to accomplish fuel tank shielding by using shielding already available and

used in the industry. See Elwell Depo. at 133-34. Alternatively, Faniola asserts that Mazda could have relocated the tank if it preferred not to use a shield. See Dynamic Science to NHTSA Neva Johnson Study at 74, 82-83, 157 (locating the fuel tank above the rear axle -- or in the case of a front-wheel drive vehicle like the Mazda Protege, above the rear suspension -- allows the tank to be isolated more effectively from possible sources of puncture, with the rear structure of the car affording some degree of impact protection).

## PROCEDURAL BACKGROUND

Faniola sued MC and MNAO for the injuries arising out of the accident. Faniola's case is about an alleged defective fuel tank in the 1992 Mazda Protege. Faniola's defect allegations include both negligence and strict product liability theories stemming from the defective design, production, and marketing of Faniola's 1992 Protege. See Wallingford Depo. at 101, line 9; Elwell Depo. at 139, lines 3-11.

One of Faniola's causes of action is a claim for punitive damages. Mazda moves for summary judgment on Faniola's cause of action for punitive damages pursuant to rule 56(b) of the Federal Rules of Civil Procedure.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-

49 (1986). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587(1986).

The moving party has the burden of showing the absence of a genuine issue concerning any material fact. See Adickes V.S.H. Kress and Co., 398 U.S. 144, 157 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317,323 (1968). The party resisting the motion must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Manders v. Oklahoma ex. rel. Dep't of Mental Health, 875 F.2d 263, 265 (10th Cir. 1989).

## LAW ON PUNITIVE DAMAGES

Punitive damages may only be awarded upon proof that a defendant acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently. See Torres v. El Paso Electric Co., 1999-NMSC-029, ¶ 27, 987 P.2d 386, 397; Clay v. Ferrellgas, Inc., 118 N.M. 266, 269, 881 P.2d 11, 14 (1994); Gonzales v. Surgidev, 120 N.M. 133, 147-48, 899 P.2d 576, 590-91 (1995). See also U.J.I. 13-1827 NMRA (punitive damages may be awarded when a party's conduct is "malicious, willful, reckless, wanton, fraudulent or in bad faith."). "In the context of a punitive damages claim, 'reckless' is defined as 'the intentional doing of an act with utter indifference to the consequences.'" Gonzales v. Surgidev, 120 N.M. at 145, 899 P.2d at 588. "The defendant must act knowingly, displaying an evil motive or culpable mental state." Smith v. Ingersoll-Rand Co., 214 F.3d 1235,

1250 (10th Cir. 2000).

Awarding punitive damages absent a culpable mental state defies the primary purpose of punitive damages: to punish deliberately wrongful conduct and to deter such conduct in the future. See Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 212, 880 P.2d 300, 309 (1994)(reversed punitive damages award based upon defendant's failure to exercise ordinary care). Therefore, at a minimum, one must prove a conscious or deliberate disregard of a potential harm in order to justify an award of punitive damages. See id. To prove reckless disregard or indifference, Faniola must establish Mazda consciously or deliberately committed an act with utter indifference to the consequences. See Kennedy v. Dexter Consolidated Schools, 129 N.M. 426, 446-47, 10 P.3d 115, 125-26 (2000). Reckless disregard "occurs when the defendant knows of potential harm to the interests of the plaintiff, but nonethless utterly fails to exercise care to avoid harm." Smith v. Ingersoll-Rand Co., 214 F.3d at 1251; Paiz v. State Farm Fire & Cas. Co., 118 N.M at 212, 880 P.2d at 309.

In a product liability case, the knowledge factor is extremely important. "A defendant that is unaware of a product's defect can hardly 'consciously' or 'recklessly' disregard any other party's rights. [Numerous] cases bear out the proposition that with every award of punitive damages, the defendant-manufacturer was aware of the existing defect and also aware of the serious danger of substantial harm posed by that defect." 1 J. Kircher & C. Wiseman, Punitive Damages: Law and Practice § 6.21 (2000). In Clay v. Ferrellgas, Inc., a negligence action, the Supreme Court of New Mexico stated that, to be liable for punitive damages, the wrongdoer must "have some culpable mental state" and his conduct must "rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level [.]" The court stated "as the risk of danger increases, the duty of care also

increases." 118 N.M. at 269, 881 P.2d at 14.

## LEGAL ANALYSIS

Faniola makes two arguments in support of her contention that her claim for punitive damages should go to a jury: (i) Mazda did not sufficiently test the 1992 Mazda Protege for fuel tank safety from road hazards; and (ii) Mazda did not sufficiently protect the Protege's fuel tank in Mazda's design of the vehicle. Specifically, Faniola contends that Mazda knew of potential road debris hazards and should have conducted testing to determine whether such hazards would breach the integrity of the Protege's fuel tank. If Mazda had conducted such testing, it would have learned that it should have designed the fuel tank differently -- either by changing its location or including a protective shield.

The Court cannot say, from the evidence in the record, that a reasonable factfinder could find that Mazda had a culpable mental state in designing the fuel tank for the 1992 Mazda Protege. Mazda's design was and is accepted in the industry. The evidence is that Mazda designed and tested the 1992 Protege to meet federal safety standards. Faniola has not sufficiently demonstrated a genuine issue of material fact exists regarding the Defendants' alleged callous indifference and recklessness to allow Faniola's seventh cause of action for punitive damages to go forward. While Mazda had knowledge about the possibility of fuel tank punctures like the one in this case and in similar accidents or incidents, the evidence does not support Faniola's contention that Mazda did nothing. Faniola concedes that it is rare for a fire to occur in an automobile collision. A fire occurs in about three out of every one thousand collisions. Nevertheless, each year over a thousand people suffer disfiguring or fatal burn injuries in post-collision fires. Faniola contends that the automobile industry has known of these injuries and deaths can be attributed to dangerous and

defective fuel tank designs, which are subject to failure in the event of a collision. Faniola contends that safer fuel tank design has been technologically and economically available for more than 30 years, but much of the auto industry, including Mazda, has resisted implementing alternative designs. See "Fuel System Integrity Upgrade," NASS & FARS Case Study, prepared for the U.S. DOT, NHTSA (1994); "Fire in Roadway Accidents: The Traffic Accident Research Unit, Dept. of Motor Transport (Australia, Jan. 1970); "Mazda's Comments to NHTSA re: FMVSS 301, "Fuel System Integrity," Docket No. 92-66.

Faniola has not, however, established an issue of fact that Mazda had knowledge its 1992 Protege could not withstand the hazards that it knew about. As noted above, the key here is Mazda's knowledge. The Court does not see support that Mazda knew of potential harm to the interests of Faniola and utterly failed to exercise care to avoid that harm. The Court will, therefore, grant the motion and dismiss Faniola's claim for punitive damages.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment Against Plaintiff's Claim for Punitive Damages is granted. The Court will dismiss the Plaintiff Michelle Faniola's seventh cause of action for punitive damages.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Roy A. Jacobson, Jr.
J. Douglas McCalla
Larissa A. Ferullo
SPENCE, MORIARITY & SHOCKEY, LLC
Jackson, Wyoming

    - and -

Dennis K. Wallin
LAW OFFICES OF DENNIS K. WALLIN, PC
Moriarty, New Mexico

    *Attorneys for Plaintiff Michelle Faniola*

Jeffrey M. Croasdell
Matthew S. Wermager
Michael Brescia
RODEY DICKASON SLOAN AKIN & ROBB, PA
Albuquerque, New Mexico

    - and -

Gerard Cedrone
LAVIN COLEMAN O'NEIL RICCI FINARELLI & GRAY
Philadelphia, Pennsylvania

    *Attorneys for Defendants Mazda Motor Corporation and Mazda Motor of America*